2022 IL App (1st) 200318-U

No. 1-20-0318

Order filed September 14, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 16686 |
| | ) | |
| EDWARD BLUE, | ) | Honorable |
| | ) | Steven J. Goebel, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court.
Presiding Justice McBride and Justice Burke concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the circuit court's summary dismissal of defendant's first-stage postconviction petition over his contention that he stated the gist of a constitutional claim of ineffective assistance of counsel.

¶ 2     In 2015, on the first day of trial and following two fitness hearings, defendant Edward Blue pled guilty to aggravated criminal sexual assault (ACSA) in exchange for 18 years' imprisonment. He now appeals the summary dismissal of his *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). He argues on this appeal that the circuit

court erred in summarily dismissing his petition where he made an arguable claim of ineffective assistance of defense counsel for failing to investigate his sanity with treating mental health professionals and not presenting an insanity defense. For the following reasons, we affirm.

¶ 3    In October 2011, the State charged defendant, who was 16 years old at the time, with multiple counts of ACSA, criminal sexual assault, aggravated criminal sexual abuse, and criminal sexual abuse. The charges stemmed from an incident on September 12, 2011, involving a social worker at the Little City Foundation facility (Little City) where defendant resided. Little City is a residential facility for children who have intellectual and developmental disabilities. Defendant had resided there for almost a year at the time of the offense.

¶ 4    On January 26, 2012, the trial court ordered a behavioral clinical examination (BCX) as to defendant's sanity at the time of the offenses and fitness to stand trial. In May 2012, Forensic Clinical Services of the Circuit Court of Cook County (Forensic Clinical Services) psychologist Dr. Susan Messina and psychiatrist Dr. Nishad Nadkarni submitted their reports opining defendant was fit to stand trial. In his letter, Dr. Nadkarni explained that "despite his cognitive limitations, [defendant] demonstrates an adequate capacity to assist counsel in his defense and to maintain appropriate courtroom demeanor, if he so chooses. Any observations to the contrary should be interpreted as volitional on the part of the defendant." Dr. Nadkarni further noted that defendant's medication did not impair his fitness. On September 27, 2012, the trial court ordered another BCX, directing the Forensic Clinical Services to re-evaluate defendant on his fitness to stand trial, with or without medication.

¶ 5    On May 30, 2013, during a status hearing regarding the defense's retention of expert witnesses, the sheriff stated that defendant "doesn't want to come out. He says he's hearing voices

in his head." Pursuant to the defense's request, the trial court entered an order directing defendant to be examined at Cermak Hospital for "a mental health evaluation" and "appropriate placement within the Department of Corrections and necessary medication."

¶ 6 On July 2, 2013, the trial court made an entry on the half sheet that it had a "bona fide doubt" as to defendant's fitness and sanity and ordered Forensic Clinical Services to re-evaluate defendant for those issues.[1] On August 6, 2013, the court ordered another BCX for defendant to be re-evaluated for fitness and sanity. In a letter to the court dated September 25, 2013, Dr. Nadkarni stated that he was unable to render an opinion regarding "the referral issues" because defendant used "foul and abusive language" and refused to participate in an evaluation.

¶ 7 On December 3, 2013, the trial court again ordered that defendant to be re-evaluated for fitness and sanity. In a letter to the court dated December 11, 2013, Dr. Nadkarni opined "to a reasonable degree of medical and psychiatric certainty, that [defendant was] fit to stand trial."

¶ 8 On December 23, 2013, the court commenced a hearing on defendant's fitness to stand trial, which was later continued to various dates. The court heard the testimony out of order and allowed the defense to call its expert witness first.

¶ 9 For the defense, Dr. Carl Martin Wahlstrom, Jr. testified as an expert in forensic psychiatry and had been retained to render an opinion as to defendant's fitness to stand trial. He reviewed over 140 documents relating to defendant prior to interviewing him and preparing his report. Included in these documents were psychological and psychiatric evaluations that had been prepared by prior treating medical providers over the course of defendant's lifetime. The documents revealed defendant had been removed from his home by the Department of Children

---

[1] There is no report of proceedings in the record on appeal for this date.

and Family Services at age four based on allegations of abuse and neglect, and he lived in foster and group homes throughout his life. Defendant had been hospitalized at least 11 times for psychiatric treatment and was treated on an ongoing basis with psychiatric medications.

¶ 10    Dr. Wahlstrom interviewed defendant in October 2013 and concluded he was "immensely unfit to stand trial." During the interview, defendant reported having auditory hallucinations and was being treated with antipsychotic medication, which Dr. Wahlstrom deemed was insufficient to treat him. Based on the interview and a review of defendant's records, Dr. Wahlstrom concluded that defendant had a mild intellectual disability and intermittent explosive disorder, which caused him to "respond[] explosively to what would be considered ordinary life stressers [*sic*]" and "may act out excessively verbally or physically." He had a history of outbursts at court hearings and had been charged with crimes in additional cases while the instant case was pending.

¶ 11    Dr. Wahlstrom also opined that defendant was impaired in his ability to communicate and collaborate with his attorney "regarding pertinent facts, including movement, timing, mental state and actions at the time of the offense *** as well as to communicate non delusionally regarding his circumstances during that time period." During the interview, defendant became increasingly agitated and abruptly ended the interview.

¶ 12    Dr. Wahlstrom testified that he had reviewed the report prepared by Dr. Nadkarni finding defendant fit to stand trial. Contrary to Dr. Nadkarni's findings, Dr. Wahlstrom found that defendant did not understand the charges pending against him. However, Dr. Wahlstrom acknowledged that defendant terminated the examination before Dr. Wahlstrom could have a complete understanding of defendant's understanding, "because he seemed to be decompensating."

¶ 13 On cross-examination, Dr. Wahlstrom testified that defendant understood the roles of the public defender, judge, and prosecutor. Dr. Wahlstrom understood defendant's responses during the interview, which were "on topic," although defendant "said a number of things that were not accurate." When defendant spoke about the case, he became "tangential" and minimized what he had done.

¶ 14 For the State, Dr. Nadkarni testified as an expert in the field of forensic psychiatry. Dr. Nadkarni testified he had received court orders to evaluate defendant for (1) fitness to stand trial ordered on January 26, 2012; (2) fitness to stand trial, fitness with medications, and sanity at the time of the offense ordered on December 19, 2012; and (3) fitness to stand trial ordered on December 3, 2013.

¶ 15 Dr. Nadkarni interviewed defendant in May 2012. Prior to the interview, he reviewed various records, including a January 2012 consolidated referral order, a May 2012 Forensic Clinical Services psychological summary prepared by Dr. Messina, a Cermak medication profile, police reports and documentation relating to the instant offense, Little City staff statements, a 2002 "Little City Foundation Spruce" evaluation, and a 2011 psychological evaluation. During the interview, Dr. Nadkarni noted defendant displayed "moderate cognitive impairments" but "no psychiatric impairments."

¶ 16 Dr. Nadkarni found that the defendant understood the roles of the judge, jury, and attorneys. Defendant knew he was charged with "criminal sex assault" for "having sex with a woman." He understood that, if he was found guilty, he would go to jail for "30 years" and, if he was found not guilty, he would go home, and the charges would be dropped.

¶ 17 Dr. Nadkarni diagnosed defendant with a disruptive behavioral disorder, mild mental retardation, and a history of head injury. He acknowledged defendant had been prescribed an antipsychotic and mood stabilizer while in jail but clarified it had been used to control any outbursts from behavior that defendant may have had or any altercations. In Dr. Nadkarni's opinion, within a reasonable degree of medical and psychiatric certainty, defendant was fit to stand trial. Dr. Nadkarni did not believe that defendant required psychotropic medications to maintain his fitness status.

¶ 18 Dr. Nadkarni attempted to interview defendant in September 2013, but defendant refused to be examined. Dr. Nadkarni subsequently observed defendant calmly eating his lunch and behaving appropriately with other inmates and staff. He observed no evidence of a *bona fide* cognitive or psychiatric impairments that would have prevented defendant from cooperating with him on that date and knew defendant had a history of malingering and exaggerating. While defendant had cognitive impairments, Dr. Nadkarni believed he was exaggerating them, and none of his impairments would have prevented him from cooperating in the interview.

¶ 19 On December 10, 2013, Dr. Nadkarni again examined defendant and opined that he was fit to stand trial. Prior to the interview, Dr Nadkarni reviewed additional reports and newly available data, including Dr. Wahlstrom's November 2013 psychiatric evaluation. Defendant was cooperative for this interview and denied having any symptoms consistent with major mental illness, such as hallucinations or delusions. Defendant told the doctor that he "attempted to hang" himself because he was "mad with staff." He had been taking an antipsychotic and mood stabilizer, along with Benadryl for side effects. Defendant further stated that he had "picked up" two additional charges for criminal damage to property while incarcerated.

¶ 20    Dr. Nadkarni again diagnosed defendant with unspecified disruptive behavioral disorder, mild intellectual development disorder (previously known as mental retardation), and a past history of a head injury. Defendant displayed an adequate understanding of the nature of the charges, the nature of courtroom proceedings, and the roles of courtroom personnel. He also displayed an adequate capacity to fully assist counsel in his defense if he chose to do so. Dr. Nadkarni opined that if defendant was non-cooperative, it was a volitional choice and not due to any mental impairments.

¶ 21    On cross-examination, Dr. Nadkarni testified defendant had resided at Little City for the past six years. He did not have defendant's medical records from various hospitals where he had been previously admitted. Dr. Nadkarni reviewed the July 29, 2011, report prepared by Dr. Martin Blackman, a licensed clinical psychologist, who had interviewed defendant to determine his level of functioning prior to this incident. Dr. Blackman had previously diagnosed defendant with bipolar disorder, intermittent explosive disorder, oppositional defiance disorder, mild mental retardation, and a variety of medical conditions, including a history of seizures, cranial surgery, and a MRSA infection.

¶ 22    Dr. Nadkarni acknowledged defendant had a life-long history of being qualified for special education, and had learning disabilities, behavioral disorders, and caused emotional disturbances. Defendant's psychiatric history included 25 psychiatric hospitalizations beginning prior to age 12. Prior to the May 2012 interview, defendant had been diagnosed with bipolar disorder and schizophrenia. When asked if he believed defendant had been misdiagnosed in the past, Dr. Nadkarni testified that, in his experience, it was common for people with severe disruptive behavioral patterns to be diagnosed with bipolar disorder, schizophrenia, schizoaffective, and post-

traumatic stress disorder. However, defendant did not display evidence "anywhere" of a major depressive or manic mood episode, psychotic symptoms, hallucinations, or symptoms consistent with delusion that would define any of those major mental illnesses. Defendant became disturbed during Dr. Nadkarni's testimony and interrupted with an expletive-filled outburst, resulting in his removal from court.

¶ 23     Dr. Nadkarni resumed testifying that defendant reported being hospitalized because of his "acting out" behavior and the resulting criminal damage to property charges he incurred while incarcerated. The hospitalizations did not involve hallucinations or delusions. Regarding defendant's outbursts during the hearing that he observed, Dr. Nadkarni testified that he observed "an individual that demonstrated no severe cognitive impairment that was responsive albeit hostile to redirection. He did not demonstrate any signs of psychiatric acute impairment, was not psychotic, was not manic or experiencing major depressive symptomology."

¶ 24     Following arguments, the court found defendant fit to stand trial, stating it evaluated Drs. Wahlstrom and Nadkarni's testimony "along with" its personal evaluation of defendant. The court found defendant's outburst "very coherent even though it was unpleasant." In the court's view, defendant knew what was going on and "once he found things weren't going his way," he "became very hostile and abrasive and certainly he did understand this proceeding very well." The court further stated that defendant "certainly does know how to manipulate certain situations maybe to his disadvantage."

¶ 25     On December 23, 2014, defendant filed a motion to advance the trial date because he had retained a psychologist to evaluate him for "fitness, and sanity at the time of this incident." A

criminal disposition sheet dated both January 25, 2015, and March 5, 2015, reflected that Dr. Wahlstrom was to interview defendant for fitness and sanity.

¶ 26    At an April 23, 2015, status hearing, defense counsel informed the court that defendant was evaluated for sanity "but that's not an issue. *** I'm not raising sanity as a defense in this matter." The State requested defendant be evaluated for sanity and fitness based on the prior history of the case. After discussing whether defendant had previously been evaluated for sanity at the time of the offense, the parties agreed that it had been requested but not completed. The State explained that defendant did not submit to the interview with the doctor. On the same day, the court entered a consolidated referral order, directing Forensic Clinical Services to evaluate defendant for fitness to stand trial, fitness to stand trial with medication, and sanity.

¶ 27    Pursuant to the court's order, Dr. Messina submitted a letter to the court dated May 22, 2015. The top of the letter listed case numbers 11 CR 16686 (the ACSA case at bar), 13 CR 22400 (criminal damage to property), 14 CR 00828 (criminal damage to property), and 14 CR 15545 (criminal damage to property). Based on her examination of defendant and review of available records, Dr. Messina opined to a reasonable degree of psychological and scientific certainty that defendant was "fit to stand trial," and defendant was "legally sane at the time of the alleged offenses." Dr. Messina stated that defendant "was not experiencing symptoms of a prominent mental disease or defect at the time of the alleged offenses that would have precluded him from being able to appreciate the criminality of his conduct at those times."

¶ 28    Dr. Messina's letter referenced her "psychological summary" for the basis of her opinions, which listed the 33 records that she had reviewed as part of her evaluation. With respect to the ACSA charge, Dr. Messina summarized defendant's account of the offense given during her

interview. Defendant had been "reluctant to discuss the alleged offense stating it was a long time ago and 'I don't know.' " Defendant denied knowing the victim and stated he had been riding his bike home from his girlfriend's house when "a Crown Vic pulled up and said [he] fit the description of a case" and "took him in." Defendant did not remember taking medication and did not report experiencing symptoms of a psychotic disorder.

¶ 29    At a hearing on May 26, 2015, the court asked defense counsel whether defendant had been found insane, and counsel responded that the defense doctor found defendant "Not insane but unfit."

¶ 30    On July 13, 2015, the court conducted a second fitness hearing. For the defense, Dr. Wahlstrom testified that he evaluated defendant for fitness to stand trial a second time, in March 2015, and found defendant more cooperative in the second interview. Dr. Wahlstrom had prepared an April 2015 report, concluding that defendant was not yet fit to stand trial.

¶ 31    Dr. Wahlstrom diagnosed defendant with an intellectual disability, an intermittent explosive disorder, "an other specified schizophrenia spectrum, and other psychotic disorder that was in partial remission." Defendant "acts out" when he becomes stressed and had problems with intermittent explosive disorder for "a good deal of his life." He resided in supportive facilities as a result. At the time of the interview, defendant had been prescribed Zyprexa, which was an antipsychotic medication and also used as a mood stabilizer in bipolar disorders; Tegretol, an anticonvulsant medication also used in acute bipolar disorders and at times schizophrenia; and Benadryl, a sedating antihistamine medication. Defendant denied having auditory hallucinations.

¶ 32    Despite defendant's improvements, Dr. Wahlstrom opined that defendant needed to be treated more aggressively in a psychiatric setting before he would be able to assist in his own defense and testify relevantly and rationally. He concluded defendant was unfit to stand trial.

¶ 33    On cross-examination, Dr. Wahlstrom testified that defendant discussed his case, understood the conversation, and gave no indication he did not understand the questions being asked. He acknowledged that in a November 2014 mental health treatment plan, defendant reported feeling he did not have psychiatric issues but anger issues. Dr. Wahlstrom did not observe defendant display any psychotic symptoms during the March 2015 interview.

¶ 34    Dr. Messina testified on behalf of the State. She evaluated defendant in February 2015 and concluded defendant was fit to stand trial because he conveyed all the roles of court personnel correctly, understood courtroom procedure, demonstrated no problem understanding or responding to her questions, and evidenced an ability to work with defense counsel. In reaching her conclusions, Dr. Messina reviewed various medical and psychiatric records, police reports, and court transcripts.

¶ 35    Dr. Messina evaluated defendant again in May 2015. Defendant was cooperative and did not show any serious cognitive disfunction. Regarding his pleas on the multiple cases, defendant stated he was "not guilty by reason of insanity" for his criminal damage to property charges acquired while incarcerated and "not guilty right now too" for his ACSA charge. Dr. Messina clarified that defendant did not state he was not guilty by reason of insanity as to his ACSA charge. She did not mention insanity to defendant and believed his response was significant because he knew there was an alternative to "guilty" and "not guilty," which was not typical. Dr. Messina again concluded that defendant was fit to stand trial.

¶ 36    Dr. Messina diagnosed defendant with borderline intellectual functioning based on her review of his records and her interactions with him but did not believe a mental retardation diagnosis was appropriate. Dr. Messina also did not believe defendant suffered from any serious mental illness, and his acting out behaviors were volitional, explaining he acted aggressively when he did not obtain his way. She defined "volitional behavior" as "something that is typically decided in advance, it's controlled, or planned, it's purposeful, as opposed to a behavior that's the result of a serious mental disorder that is the product of that disorder that is not under that person's control, such as hallucinations or severely disorganized thinking." Dr. Messina also characterized defendant's behavior as "manipulative."

¶ 37    On cross-examination, Dr. Messina acknowledged that, as a psychologist, she was not a medical doctor licensed to prescribe medication. She did not retest defendant to determine whether he was malingering in 2015 because there was no concern that he was malingering at that time. By contrast, defendant was found to be malingering during the 2013 evaluation.

¶ 38    The court found defendant fit to stand trial based on Drs. Wahlstrom's and Messina's testimony, reports and transcripts, and its observations of defendant during the fitness hearings. The court specifically noted, among other things, Dr. Wahlstrom's testimony that defendant "had an understanding of the charges against him, the proceedings, and the role of the participants in the proceedings, *** the consequences of a plea and a finding of guilty and not guilty. He was also able to recall and recollect occurrences." Defendant was not disruptive during the proceeding and at times communicated with his counsel.

¶ 39    On October 19, 2015, the case proceeded to a jury trial on one count each of ACSA and criminal sexual assault. The defense planned to raise the affirmative defense of consent. The State

previously extended defendant a plea offer for an 18-year sentence on one count of ACSA. Upon questioning by the trial court, defendant stated that he was "still thinking about" the plea offer but was not ready to plead guilty.

¶ 40 During *voir dire* of the jury, defendant elected to accept the State's plea offer. The court admonished defendant regarding his plea, noting he was eligible for a 10- to 45-year sentence if convicted of both offenses. Upon asking whether defendant understood that he would be required to register as a sex offender for the rest of his life, defendant stated, "No. H*** no. No. I don't agree to that. I don't understand none of that, no." Defendant acknowledged that his attorney informed him he would be required to register as a sex offender but stated he would not do it. He then said, "I plead not guilty. F*** that." Following defendant's statements, the court indicated it would proceed with the *voir dire*. Defendant then stated,

> "This is racist as s*** what is going on in this courtroom, I'm not taking none of that s***. I don't have time for it. I don't want to hear it. I'm very upset. I'm on medication, I'm upset, I'm not focused right, my mind ain't in the right state of mind. I'm just not ready for none of this. *** So what, you're going to book me on all this racist s***? I'm being Black, the person being White?"

¶ 41 When the court informed defendant that he was required to act appropriately, defendant responded, "I was talking to you all, this questioning is over. *** I'm f*** young and the person is older. M*** f*** courtroom." The case was passed and when it was later recalled, defendant elected to plead guilty.

¶ 42 The court admonished defendant again, and he indicated he still wished to plead guilty to one count of ACSA. The factual basis for the plea was that defendant pushed the social worker

into a "laundry room bathroom facility" and, while using his arms to hold her, caused bruising to her neck and shoulders and made contact between his penis and her vagina. The court accepted the factual basis and found the plea was freely and voluntarily given. Defendant did not waive his presentence investigation report, so the court continued the case. The court told defendant, "Just remember, I'm going to leave you with this, it's not a done deal yet. I don't have to go along, okay? Take him in the back." Defendant responded, "F*** you. My auntie will blow this whole courthouse up, all right? All right? It's going to be blown up."

¶ 43    On November 3, 2015, the court sentenced defendant to 18 years' imprisonment in accordance with the plea agreement for one count of ACSA. The State nol-prossed cases 13 CR 22400, (criminal damage to property), 14 CR 828 (criminal damage to property), and 14 CR 15545 (criminal damage to property).

¶ 44    On November 23, 2015, defendant, through plea counsel, filed a motion to withdraw his plea, arguing he did not receive the benefit of his plea bargain because the State failed to dismiss pending charges against him in three unrelated cases (case numbers 15 CR 10367, 15 CR 6666, and 15 CR 1206). Defendant alleged that the State continued those cases, rather than dismiss them, in contravention of the plea agreement. He reserved the right to withdraw the motion if the State complied with the agreement and dismissed those cases.[2]

¶ 45    On March 25, 2016, defendant mailed a *pro se* motion to withdraw his plea and vacate sentence, arguing defense counsel failed to "fight for [him] because of racial profile. And bias." On April 14, 2016, the trial court denied the motion, noting it was untimely filed and nothing was "filed in the interim." Defendant did not file a notice of appeal.

---

[2] The record does not reflect whether this motion was ruled on or withdrawn.

¶ 46    On July 31, 2019, defendant filed the instant *pro se* postconviction petition, alleging, *inter alia*, that plea counsel was ineffective for advising him to plead guilty without conducting a psychiatric evaluation to determine his sanity at the time of the offense, failing to investigate the diagnoses from the mental health professionals at Little City or any other treating hospital, and failing to raise an insanity defense. He argued an insanity defense would have led to an acquittal.

¶ 47    Specifically, defendant alleged he was "insane, severely mentally ill, had severe learning and behavioral disabilities and [] was comparable to a person who was mentally retarded and [] never finished grammar school." He further alleged he was heavily medicated on the night in question, did not remember the offense, and mental health professionals told police he should not be arrested but instead put in a mental health hospital. According to defendant, had counsel investigated defendant's family, friends, and mental health professionals familiar with him, "that could have been enough to overcome the psychiatrists 'findings.' "

¶ 48    In the petition, defendant stated he attempted to obtain medical records, police reports, and transcripts, and to "see attached exhibits." He further stated that "[a]ny unattached records will not be because [he] did not exercise due diligence." Defendant acknowledged affidavits from treating mental health staff before and after his incarceration "will be needed." The record does not contain any attached exhibits.

¶ 49    On September 27, 2019, the circuit court summarily dismissed his petition, finding defendant's failure to attach any medical records to substantiate his claim, name health professionals or family who would testify on his behalf, or indicate that any witnesses would have testified he was "unfit" rendered his petition frivolous. The court also found that defendant failed to state the gist of a constitutional claim based on his ineffective assistance of counsel claim for

failure to investigate an insanity defense, given Dr. Messina's conclusion defendant was sane at the time of the offense and fit to stand trial. The court also noted that defendant's expert, Dr. Wahlstrom, had reviewed his medical and psychiatric records and did find him unfit to stand trial, but sane at the time of the offense.

¶ 50    We allowed defendant leave to file late notice of appeal on February 26, 2020.

¶ 51    On appeal, defendant contends the circuit court erred in summarily dismissing his petition because he set forth a non-frivolous claim that defense counsel rendered ineffective assistance by failing to interview and present evidence from his treating mental health professionals, which would have supported his insanity defense and arguably led to an acquittal at trial.

¶ 52    The Act sets forth a three-stage process as a means for criminal defendants to challenge their convictions based on constitutional violations. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008). Defendant's petition for postconviction relief was summarily dismissed at the first stage, where the circuit court independently reviews the petition, taking the well-pleaded allegations as true, and determines whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *People v. Robinson*, 2020 IL 123849, ¶ 45. A petition may be summarily dismissed as "frivolous or patently without merit only if the petition has no arguable basis either in law or in fact." *People v. Tate,* 2012 IL 112214, ¶ 9. A claim has no arguable basis when it is based on an indisputably meritless legal theory, such as one completely contradicted by the record, or a fanciful factual allegation, such as those that are fantastic or delusional. *People v. Brown,* 236 Ill. 2d 175, 185 (2010).

¶ 53    A postconviction petition must "have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West

2018). "The failure to comply with section 122-2 is fatal and by itself justifies the petition's summary dismissal." *People v. Harris*, 224 Ill. 2d 115, 126 (2007). The purpose of this requirement is to allow the circuit court to corroborate a defendant's allegations with independent or objective facts. *People v. Hodges*, 234 Ill. 2d 1, 10 (2009).

¶ 54 As an initial matter, defendant did not attach to his petition the mental health records or supporting affidavits from treating medical staff that form the basis of his ineffective assistance of counsel claim, nor did he adequately explain their absence or the content of the records that would demonstrate his insanity at the time of the offense. Defendant does not state with any specificity even the names of treating physicians and how their diagnoses could support his claim. Although he stated that any unattached documents were not due to his failure to exercise due diligence, he does not explain why he was unable to furnish his own records or provide relevant names. More importantly, because the purpose of this requirement is to enable the circuit court to corroborate the allegations with independent or objective facts (*Hodges*, 234 Ill. 2d at 10), the absence of these records renders defendant's conclusory allegations entirely unsupported and "by itself justifies" the circuit court's summary dismissal of his petition (*Harris*, 224 Ill. 2d at 126).

¶ 55 Even excusing defendant's lack of supporting documentation, we find defendant's conclusory allegations were insufficient to present the gist of a constitutional claim of ineffective assistance of counsel. To survive the first stage, a petition need only present the gist of a constitutional claim. *People v. Allen*, 2015 IL 113135, ¶ 24. Presenting a "gist" of a constitutional claim is a low threshold, and only limited detail is necessary for the petition to proceed beyond the first stage of postconviction review, as opposed to setting forth a claim in its entirety. *Hodges,* 234 Ill. 2d at 9. This court reviews the summary dismissal of a postconviction petition *de novo*. *Hodges*,

234 Ill. 2d at 9. We review the circuit court's judgment and not the reasons cited for the judgment, and we may affirm the court on any basis supported by the record. *People v. Munoz*, 406 Ill. App. 3d 844, 850 (2010).

¶ 56 In this case, defendant claims that he was denied effective assistance of counsel prior to pleading guilty because an insanity defense was not investigated. We review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Hatter*, 2021 IL 125981, ¶ 25. Under *Strickland*, a defendant must show counsel provided deficient performance which resulted in prejudice. *Hatter*, 2021 IL 125981, ¶ 25 (citing *Strickland*, 466 U.S. at 687-88). At the first stage of proceedings under the Act, "a petition alleging ineffective assistance of counsel may not be summarily dismissed if (1) counsel's performance arguably fell below an objective standard of reasonableness and (2) the petitioner was arguably prejudiced by the deficient performance." *Hatter*, 2021 IL 125981, ¶ 25 (citing *Hodges*, 234 Ill. 2d at 17).

¶ 57 Defense counsel's duties include the duty to investigate any possible defenses. *People v. Domagala*, 2013 IL 113688, ¶ 38. "Where the record establishes that counsel had reason to know, from an objective standpoint, that a possible defense, such as insanity, was available, failure to investigate fully can constitute ineffective assistance of counsel." (Internal quotation marks omitted.) *Domagala*, 2013 IL 113688, ¶38. We note that "fitness and insanity raise different inquiries" (*People v. Burton*, 184 Ill.2d 1, 26 (1998)), and "there are significant differences between a claim of unfitness to stand trial and a plea of insanity" (*People v. Clay*, 361 Ill. App. 3d 310, 324 (2005)). "Fitness addresses a defendant's ability to function and participate in court proceedings," while "insanity involves whether a defendant, because of a mental disease

or defect, lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." *Burton,* 184 Ill. 2d at 26. A finding of unfit to stand trial is not "proof of insanity at the time of the offense." *People v. Manns,* 373 Ill. App. 3d 232, 240 (2007).

¶ 58    In the context of a guilty plea proceeding, the first prong of the *Strickland* standard remains the same, but to satisfy the second prong, a petitioner " 'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' " *People v. Brown*, 2017 IL 121681, ¶ 26 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). Where a claim involves a defendant's prospects for acquittal, the defendant must show that he would have been better off going to trial because he would have been acquitted or had a viable defense. *Brown*, 2017 IL 121681, ¶ 34, Thus, in this type of case, our supreme court has required a claim of innocence or a plausible defense to establish prejudice. *Brown*, 2017 IL 121681, ¶ 45 (citing *Hall*, 217 Ill. 2d at 335-36); *People v. Rissley*, 206 Ill. 2d 403, 459-62 (2003).

¶ 59    Defendant was charged with ACSA for knowingly committing an act of sexual penetration upon the victim by making contact between his penis and her vagina by use of force or threat of force and bruising her neck and shoulders. 720 ILCS 5/11-1.30(a)(2) (West 2010). He was also charged with criminal sexual assault for knowingly committing an act of sexual penetration upon the victim by making contact between his penis and her vagina by use of force. 720 ILCS 5/11-1.20(a)(1) (West 2010). Insanity is an affirmative defense. 720 ILCS 5/6-4 (West 2010). As previously noted, in Illinois, a person is insane and "not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2010).

¶ 60    With respect to counsel's performance under the first prong of *Strickland*, we find defendant has not demonstrated counsel's assistance was arguably deficient. Defendant claims counsel advised him to plead guilty without ascertaining his sanity at the time of the offense. This is positively rebutted by the record, which shows that, prior to the plea, the trial court repeatedly ordered that defendant be evaluated for sanity of the time of the offense and Dr. Messina presented her uncontradicted conclusion that defendant was sane when he committed the offense.

¶ 61    Dr. Messina reviewed Dr. Wahlstrom's reports among other records in reaching her conclusion that defendant was sane at the time of the offense. In her May 2015 letter to the court, Dr. Messina explained defendant was "not experiencing symptoms of a prominent mental disease or defect at the time of the alleged offenses that would have precluded him from being able to appreciate the criminality of his conduct at those times." The record therefore shows defendant had been evaluated prior to the plea hearing and found sane at the time of the offense.

¶ 62    Dr. Messina's conclusion regarding defendant's sanity was uncontested. Although Dr. Wahlstrom evaluated defendant and found him unfit to stand trial, he reached no conclusion that defendant was insane at the time of the offense. Under questioning by the court during a hearing in May 2015, defense counsel acknowledged the defense's "doctor," arguably Dr. Wahlstrom, found defendant "Not insane, but unfit." Additionally, there was ample testimony showing defendant had a history of malingering and manipulative behavior and did not exhibit major psychiatric impairments. All of this information was known when defendant accepted the plea offer in October 2015 and defeats any arguable ineffective assistance of counsel claim based on deficient performance for not further pursuing an insanity defense. See *People v. Woods*, 2014 IL App (1st) 121408, ¶ 77 (defense counsel's performance was not deficient for failing to assert an

insanity defense where an expert concluded the defendant was not insane at the time of the offense).

¶ 63    Additionally, defendant's claim that counsel failed to investigate the diagnoses from mental health professionals at Little City, where he was living at the time of the offense, or other treating hospitals is similarly rebutted by the record. The record shows that defense counsel was clearly familiar with defendant's medical records and psychiatric history as evidenced by his direct and cross-examination of witnesses at his fitness hearings. Counsel extensively examined the three testifying doctors regarding defendant's medical history and past hospitalizations, which included records from his time at Little City. Accordingly, defendant did not make an arguable showing that counsel's performance was deficient for failing to investigate his sanity at the time of the offenses. *People v. Patterson,* 192 Ill. 2d 93, 107 (2000) (failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel).

¶ 64    Even if we were to assume counsel's performance was deficient, defendant failed to demonstrate that he was arguably prejudiced by counsel's performance by showing he would have been better off going to trial. Defendant faced up to 45 years' imprisonment and would be required to register as a sex offender if convicted of both offenses. Instead, by pleading guilty, he received an 18-year sentence and was required to register as a sex offender. Although in his petition he claims he was heavily medicated and could not remember the offense, we again note that he has not included specific factual allegations to support his contention that his treating physicians would have offered any testimony to corroborate this claim in support of an insanity defense. Moreover, as previously noted, Dr. Messina evaluated defendant and concluded he was sane at the time of the offense. Further, the testimony at his fitness hearings revealed he was able to discuss his case

with the different doctors, and the circuit court concluded he was able to "recall and recollect occurrences."

¶ 65    Defendant relies heavily on his general background and psychiatric history in support of his conclusory statement that counsel was ineffective for failing to investigate an insanity defense. It is undisputed that defendant had cognitive impairments and multiple volatile outbursts in court. To the extent that defendant alleges that these outbursts support an inquiry into his sanity, the circuit court explicitly found that defendant's outbursts were "very coherent" and "lucid." Moreover, both Drs. Messina and Nadkarni testified defendant's behavior was volitional and he did not suffer major psychiatric impairments.

¶ 66    Importantly, the fact that defendant suffered cognitive impairments and had longstanding mental health issues, without more, is insufficient to show insanity would have been a plausible defense for him. See *People v. Gilmore*, 273 Ill. App. 3d 996, 1000 (1995) (a defendant's unusual behavior or bizarre or delusional statements do not compel a finding of insanity, and a defendant may suffer from a mental illness without being legally insane); see *e.g.*, *People v. Plackowska*, 2020 IL App (2d) 171015, ¶ 52 (finding the trial court's rejection of the defendant's insanity defense was not against the manifest weight of the evidence, despite evidence that the defendant suffered from a mental illness and was in a "psychotic state" on the night of the offenses).

¶ 67    Defendant points to nothing specific to show that, at the time of the offense, he could not appreciate the criminality of his conduct. Nor does he allege that his treating physicians at the time of the offense would offer such a conclusion. Instead, he speculates that those providers "could" support an insanity defense. Such conclusory allegations underlying his claim of ineffective assistance of counsel are insufficient to survive first-stage postconviction review. See *People v.*

*Delton*, 227 Ill. 2d 247, 258 (2008) ("[B]road conclusory allegation[s] of ineffective assistance of counsel * * * are not allowed under the Act.").

¶ 68    We further find that defendant forfeited his claim of ineffectiveness of counsel for failing to investigate and raise a claim based on the possibility of a guilty, but mentally ill (GBMI) verdict. We first note that defendant did not raise this particular claim in his petition, and it is impermissibly raised for the first time on appeal. See *People v. Pendleton*, 223 Ill. 2d 458, 475 (2006) (citing *People v. Jones*, 213 Ill. 2d 498, 505 (2004)) (claims not included in a postconviction petition may not be raised for the first time on appeal). Although we would prefer to decide this case on its merits, our supreme court has prohibited the appellate court from doing so and the issue is forfeited.

¶ 69    The result in this case of forfeiture is controlled by our supreme court's holding in *Jones*, 223 Ill. 2d at 458, and *Pendleton*, 223 Ill. 2d at 458. We, therefore, find that defendant may not raise the claim of ineffective assistance of counsel for failing to investigate and raise a claim based on the possibility of a guilty, but mentally ill (GBMI) verdict for the first time on appeal. The proper forum for the claim is a successive postconviction petition, as the supreme court noted in *Jones*: "When appellate counsel discovers errors not raised by their clients during the summary, first-stage postconviction proceedings, the proper course of action for counsel to take is to file a successive petition in which the newly found claim is properly alleged." *Jones*, 223 Ill. 2d at 509.

¶ 70    Where a defendant fails to prove insanity, he may be found GBMI if the defendant proves by a preponderance of the evidence that he was mentally ill at the time of the offense, as defined in subsections (c) and (d) of Section 6-2 of the Criminal Code of 2012 (725 ILCS 5/115-3(c) (West 2010)). "Mental illness" or "mentally ill" is "a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that

person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior." 720 ILCS 5/6-2(d) (West 2010). With a GBMI verdict, the Department of Corrections "shall cause periodic inquiry and examination to be made concerning the nature, extent, continuance, and treatment of the defendant's mental illness" and provide for the appropriate mental treatment (730 ILCS 5/5-2-6(b) (West 2010)).

¶ 71    Accordingly, we find the circuit court properly dismissed defendant's first-stage petition as frivolous and patently without merit. Defendant failed to attach the required documentation to support his claim and, additionally, failed to state the gist of a constitutional claim that counsel was ineffective for failing to investigate and present an insanity defense.

¶ 72    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 73    Affirmed.

¶ 74